## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **THE ENGY GROUP, LLC,** | § | **Case No. 17-34848** |
| | § | |
| Debtor. | § | (Chapter 11) |
| | § | |

| | | |
|---|---|---|
| | § | |
| In re: | § | |
| | § | |
| **FRANCOIS-STANISLAS BELLON,** | § | **Case No. 17-34923** |
| | § | |
| Debtor. | § | (Chapter 11) |

**DEBTORS' EXPEDITED MOTION UNDER 11 U.S.C. §§ 105(a) AND 363, BANKRUPTCY RULES 6004 AND 9019 AND LOCAL RULE 9013-1 FOR APPROVAL OF BINDING TERM SHEET FOR SETTLEMENT**

AN EXPEDITED HEARING ON THIS MOTION HAS BEEN REQUESTED BECAUSE THE SETTLEMENT TERM SHEET HAS VARIOUS DEADLINES BY WHICH THE PARTIES HAVE AGREED TO PERFORM SEVERAL OF THE UNDERTAKINGS RFEQUIRED UNDER THE SETTLEMENT TERM SHEET. THE HEARING, ONCE SCHEDULED AND NOTICED, WILL TAKE PLACE IN COURTROOM 404, 515 RUSK STREET, HOUSTON, TEXAS 77002.

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY.  YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE MARIVIN ISGUR:

Engy Group, LLC ("Engy"),  Francois-Stanislas Bellon ("Bellon"), and the other parties to the Binding Term Sheet for Settlement[1] (the "Settlement Term Sheet") file this expedited motion (the "Motion") for entry of an order substantially in the form attached hereto (the "Proposed Order"), pursuant to §§ 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6004 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Bankruptcy Local Rule for the United States Bankruptcy Court for the Southern District of Texas ("Local Rule") 9013-1 for Bankruptcy Court approval of the Settlement Term Sheet and respectfully state as follows:

## I.

## JURISDICTION AND VENUE

1.      This Bankruptcy Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), and (O). All the parties to the Settlement Term Sheet consent to the entry of a final order by the Bankruptcy Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

2.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1]   Binding Term Sheet for Settlement of Claims by and Against Green Bank; Kurt Orban Partners, Southwest Container Products LLC and Matthew Orban; Francois-Stanislas Bellon; Dr. Kenneth Lo; and the Engy Group LLC and its Subsidiaries and Affiliates, dated September 28, 2017 (the "Settlement Term Sheet"), attached to the form of the order as Exhibit A, and incorporated herein by reference.

3.     The statutory predicates for the relief sought herein are 11 U.S.C. §§ 105(a) and 363, Bankruptcy Rules 6004 and 9019, and Local Rule 9013-1.

4.     In the event the Bankruptcy Court does not approve the Motion, none of the recitations in this Motion shall be held or used against any party hereto in any future litigation.

## II.

## BACKGROUND OF THE DISPUTES BEING SETTLED

### A.     Bellon, Orban, Lo and Green Bank

5.     Bellon is an individual who resides in Houston, Texas, and is a citizen of France. Bellon is an entrepreneur who has previously led multiple start-up efforts in various industries.

6.     Matthew Orban ("Orban") resides in San Francisco, California. Orban controls Kurt Orban Partners LLC ("Partners," together with its subsidiaries and affiliates, "KOP"), a specialty steel trader purchasing globally from leading carbon, alloy, stainless and high nickel alloy manufacturers. KOP has traded steel internationally for over 100 years.

7.     Dr. Kenneth Lo ("Dr. Lo") is a radiation oncologist in Baton Rouge, Louisiana and is affiliated with multiple hospitals in the area, including Baton Rouge General Medical Center and North Oaks Medical Center.

8.     Green Bank, N.A. ("Green Bank") is a Texas-focused bank headquartered in Houston. Green Bank is a nationally-chartered commercial bank and provides commercial and private banking services at full-service offices in Houston, Dallas and Austin.

9.     Bellon, Orban, Lo and Green Bank are collectively referred to as the "Parties."

### B.     Engy Group LLC

10.     Engy is a Delaware limited liability company formed in January 2013. A corporate organizational chart of Engy and its affiliates and subsidiaries is attached hereto as **Exhibit A**.  Engy was established to be a diversified holding company with investments in real

estate, health care and the steel drum production and sale businesses.  In 2015, Bellon became the sole member of Engy.  Engy's corporate office is located at 2425 Mowery Road, Houston, Texas 77045.

11.     Engy is a holding company and is the (i) 100% owner of Engy Belvoir Ventures, LLC ("Engy Belvoir") and (ii) 94% owner of Texas Engy Drums ("Engy Drums").

12.     The corporate affairs of Engy are governed by the Amended and Restated Company Agreement of The Engy Group, LLC, dated as of November 30, 2016, but effective initially as of April 14, 2015 (the "Engy Company Agreement").  Under the Engy Company Agreement, Bellon was appointed manager of Engy.

13.     Subsequently, Bellon transferred membership interests in Engy, as follows:  (a) ten percent (10%) membership interest to Filemon "Phil" Lopez, (the president of Engy Containers), (b) five percent (5%) membership interest to Dr. Lo, and (c) two (2%) percent membership interest to Isidro Salazar Garza.  As a result of these transfers, Bellon has an eighty-three percent (83%) membership interest in Engy.

14.     Dr. Lo holds a claim against Engy in the original principal amount of $2,000,000, with accrued but unpaid interest of approximately $60,000 to $100,000.

15.     As discussed more fully below, Orban and Bellon have been in a dispute regarding the ownership of Engy.

16.     On August 4, 2017 ("Petition Date"), Engy filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court").

17.     Engy has remained in possession of its property and managed its assets as a debtor-in-possession under Bankruptcy Code sections 1107 and 1108.  It is undisputed that

Bellon has been in control of Engy since the Petition Date.  Orban and Bellon dispute who was in control prior to the Petition Date and Orban disputes that Bellon should remain in control.

18.     On August 14, 2017, Engy filed a Motion to Appoint a Trustee (the "Trustee Motion"). SWCP (defined in note 2, below) contested the propriety of Engy's chapter 11 filing and opposed the Trustee Motion.

19.     On August 15, 2017, SWCP sought a temporary restraining order placing Orban in control of Engy and its subsidiaries.  On August 16, 2017, SWCP filed a motion to dismiss Engy's bankruptcy case.

20.     On August 24, 2017, the U.S. Trustee held a meeting of creditors, pursuant to Bankruptcy Code section 341.

21.     Shortly after the Petition Date, all disputes among Orban, KOP, Bellon and Green Bank were voluntarily stayed pending mediation. An agreed mediation was scheduled before Eric Taube in Austin, Texas on September 6, 2017. Although the mediation proved unsuccessful, settlement discussions nonetheless continued.  Although Dr. Lo did not attend the mediation with Mr. Taube, he and his advisors were actively involved in settlement discussions beforehand and afterwards.  Ultimately, the Parties entered into the Settlement Term Sheet on September 28, 2017.

### C.     Engy Containers

22.     Engy Drums owns 100% of the issued and outstanding shares of Engy Southwest Container Products, Inc. ("Engy Containers").

23.     Engy Containers' mission has been to become the leading full service industrial packaging provider in the United States. The management team, partners, board of directors, and advisors leading this initiative is comprised of experienced professionals in the drum supplier

industry and material supply experts. The company is working on the team's efficiency to shorten the development schedule, reduce start-up costs, and increase profitability.

24.     Engy Containers has established a Full Life Cycle Program approach for the industrial container industry. For its customers, Engy Containers seeks to be a full-service provider for all packaging needs.

25.     Engy Containers intends to provide the North American region with sustainable industrial container solutions, container services, and container management systems for a diverse set – small, medium, large – of customers. National coverage for all customer needs include new steel drums, reconditioned steel drums, transportation services for reclaimed drums, recycled steel program with direct selling of scrap to steel mills, and toll filling, blending and storage.

26.     As a start-up venture, Engy relied on investments from affluent domestic and international investors, working capital provided by Bellon, secured loans from lenders like Green Bank, and trade and financing credit from KOP and other suppliers.

### D.     Engy Belvoir

1.     Engy Belvoir owns 50% of the interests in Engy Belvoir Healthcare LLC ("Healthcare LLC") and Dr. Lo owns the remaining 50%.  Healthcare LLC, in turn, owns an option to purchase 100% member interest in Sacred Oak Medical Center, LLC ("Sacred Oak") for $22.0 million.  Healthcare LLC provided Sacred Oak with a $6.0 million down payment on its purchase option, which entitles Healthcare LLC to 100% of the real estate and 20% of the operating company for the Sacred Oak Medical Center (the "Center").  Therefore, Healthcare LLC would need to invest an additional $16.0 million to exercise the purchase option.  Prior to

exercise, Sacred Oak has been paying monthly cash interest at a 7.5% annual rate on the $6.0 million down payment.

27.     Sacred Oak owns and operates the Center, which is located at 11500 Space Center Boulevard in Houston, Texas.  The Center provides medical services to adults with mental health issues, substance abuse rehabilitation services, partial hospitalization, and intensive outpatient programs (see www.sacredoakmedical.com).  The Center opened in July 2017.

28.     With 80 beds, the Center offers inpatient treatment programs for adults with complex psychiatric problems, including individual and group therapy, medication management, family therapy and discharge planning.  The Center's inpatient chemical dependency program offers round-the-clock supervision and a dedicated team of professionals to help adults overcome chemical dependency to addictive substances, including guarding against the dangers of withdrawal.  The Center's intensive outpatient program provides time limited, multidisciplinary, multimodal structured treatment which is less intensive than a partial hospital program but more intensive than outpatient psychotherapy.  The Center's partial hospitalization program provides services to patients transitioning from inpatient to outpatient treatment or who require a structured treatment plan and environment.

29.     Healthcare LLC has received (a) an offer to purchase its interest in the real estate involved in the Center and part of its interest in the operating company involved in the Center from a third party and (b) a separate offer to purchase its remaining interest in the operating company involved in the Center from another third party.  Both transactions are expected to close by year-end.

### E.      Mowery Plant

30.      Engy Belvoir also owns 100% of the Class B interests in Mowery Plant LLC ("Mowery Plant").

31.      Dr. Lo owns all the Class A preferred shares in Mowery Plant. Class A shares in Mowery Plant have preferential rights over all other common units in and to Mowery Plant. Dr. Lo is owed all the accrued but unpaid dividends from his ownership of the Class A shares.

32.      Mowery Plant borrowed $6.2 million from Third Coast Bank, N.A. ("Third Coast") to fund the purchase of the real property located at 2425 Mowery Road, Houston, Texas 77045.

33.      Engy Containers leases its facility from Mowery Plant. Without this lease, Engy Containers would not be in business or would, unfeasibly, have to locate an alternate facility to manufacture steel drums.

### F.      Partners Notes

34.      On or about April 19, 2017, the following promissory notes and related security agreements were executed: (a) Secured Promissory Note in the principal amount of $3,700,000 made by Engy and payable to Partners (the "Engy-Partners Note"), (b) Secured Promissory Note in the principal amount of $3,000,000 made by Engy Belvoir and payable to Partners (the "Belvoir-Partners Note"), and (c) Secured Promissory Note in the principal amount of $4,000,000 made by Engy Containers and payable to Partners (the "Container-Partners Note") (collectively, the "KOP Notes"). The KOP Notes matured on July 29, 2017.  SWCP is the assignee of KOP's rights under the KOP Notes. [2]  SWCP believes the total amount due and

---

[2] Southwest Container Products, LLC is separate Orban-related entity that is not related to Engy Southwest Container Products, Inc., the operating subsidiary of Engy Drums, which, in turn, is owned by Engy.  In the Settlement Term Sheet, the parties agreed that Southwest Container Products, LLC would be renamed "SCP, LLC"

owing exceeds the $10.7 million aggregate face amount of these notes. Engy and Bellon dispute the nature, amount, validity and enforceability of the KOP Notes.

35.     Repayment of the KOP Notes is secured by a Security and Pledge Agreement, dated on or about April 19, 2017, granting a lien and security interest in favor of SWCP, as assignee for KOP, on all assets of Engy Belvoir and Engy Drums and a pledge of Bellon's LLC interest in Engy to KOP (the "Pledge Agreements").

36.     The borrowers under the KOP Notes defaulted on July 29, 2017. The KOP Notes matured and the borrowers and Bellon were not able to repay the amounts owing thereunder.

37.     SWCP began collection efforts, including voting the membership interests under the Pledge Agreements and scheduling a private sale auction of Bellon's membership interests in Engy for August 14, 2017. Bellon disputes that SWCP had any rights to vote the membership interests.

38.     To prevent the private sale auction from proceeding, Bellon, as an individual, filed a voluntary chapter 11 petition with the Bankruptcy Court on August 14, 2017.   On September 29, 2017, the Bankruptcy Court ordered joint administration of the bankruptcy cases of Engy and Bellon.  Together, Engy and Bellon are referred herein as the "Debtors."

### G.  Green Bank Notes

39.     Green Bank entered into a Credit Agreement, dated as of February 27, 2017 (the "Credit Agreement"), with Engy Containers, Engy Drums, Bellon, and Orban (collectively, the "Borrowers"). Pursuant to the Credit Agreement, Borrowers executed a Term Loan Note with a commitment of $8,000,000 and a Revolving Loan Note with a commitment of up to $5,000,000, subject to a borrowing base (collectively, the Term Loan Note and the Revolving Loan Note

---

or a similar name acceptable to Orban, to avoid confusion in the marketplace.  Southwest Container Products, LLC's new name is "SWCP, LLC" and all references herein to it or its predecessor are to "SWCP."

form the "Green Bank Debt"). Although Engy is not obligated for the Green Bank Debt, Engy's steel drum subsidiaries, Engy Drums and Engy Containers, are primary obligors for the Green Bank Debt and all of their assets secure the repayment of the Green Bank Debt. KOP agreed to subordinate to the Green Bank Debt amounts, if any, owed to them by Engy Containers and Engy Drums.

40.     During the settlement discussions, the Borrowers owed Green Bank $2,395,000 on the Revolving Loan Note and $7,278,545.53 on the Term Loan Note. After application of the Borrowers' September 28, 2017 payment, which included principal and interest, the Term Loan Note balance became $7,157,514.55.

41.     The Green Bank Debt is also secured by a cash reserve in the amount of $1,251,559.02 held at Green Bank (the "Cash Reserve"). On September 28, 2017, the Court entered an Agreed Order Lifting Stay that allowed Green Bank to offset the Cash Reserve against the Revolving Loan Note (the "Stay Order"). As part of the compromise, the Settlement Term Sheet incorporates this setoff, which the parties agreed to implement prior to entry of the Stay Order. As such, the Borrowers currently owe Green Bank approximately $1,143,440.98 on the Revolving Loan Note.

42.     Pursuant to the Settlement Term Sheet, Dr. Lo agreed to purchase an $800,000 participation in the Green Bank Debt (9.63744% of both the Revolving Loan Note and the Term Loan Note) on September 29, 2017. Therefore, pursuant to the Credit Agreement, the Borrowers currently owe:

|  | Green Bank | Dr. Lo | Total |
|---|---|---|---|
| Revolving Loan Note | $1,033,242.49 | $110,198.49 | $1,143,440.98 |
| Term Loan Note | $6,467,713.04 | $689,801.51 | $7,157,514.55 |
| Green Bank Debt | $7,500,955.53 | $800,000.00 | **$8,300,955.53** |

43.     By October 31, 2017, if certain conditions are not satisfied, then the Settlement Term Sheet provides that Dr. Lo will purchase an incremental $950,000 participation in the Green Bank Debt (11.44447% of both the Revolving Loan Note and the Term Loan Note, bringing Dr. Lo's total participation to 21.08191% assuming no principal reduction in October 2017), as follows:

|  | **Green Bank** | **Dr. Lo** | **Total** |
|---|---|---|---|
| **Revolving Loan Note** | $5,648,573.75 | $1,508,940.80 | $7,157,514.55 |
| **Term Loan Note** | $902,381.78 | $241,059.20 | $1,143,440.98 |
| **Green Bank Debt** | $6,550,955.53 | $1,750,000.00 | **$8,300,955.53** |

44.     Until invited to a meeting by Engy in August 2017, Green Bank was not aware of the corporate control dispute between Bellon and Orban.  Upon learning of the same, Green Bank actively participated in efforts to resolve all disputes among all of the Parties.

45.     At the same time, Green Bank notified the Borrowers of an Event of Default under the Credit Agreement (the "Event of Default Notice"). The Event of Default Notice did not accelerate the debt, but suspended Green Bank's commitment to advance further funds to Borrowers.  At all times, the Borrowers paid all amounts due under the Credit Agreement.

46.     Pursuant to notices filed with the Bankruptcy Court in September 2017, Green Bank sought to obtain Rule 2004 examinations of various persons and parties.

47.     Before these Rule 2004 examinations were to begin, however, Green Bank suggested that all of the Parties make a final attempt to resolve the disputes among them amicably. After three full days of discussions and negotiations, concluding with an extended 15-hour day of drafting (which included additional discussions and negotiations) the Parties signed the Settlement Term Sheet on September 28, 2017.

48.     On September 29, 2017, Green Bank and Dr. Lo entered an agreement (the "Loan Participation Agreement"), attached hereto as **Exhibit B**, in furtherance of the Settlement Term Sheet.

## III.

## SETTLEMENT RATIONALE

49.     The Settlement Term Sheet benefits all of the Parties and is in the best interests of the Debtors' estates, their creditors, and their parties in interest.  Without a settlement, the Parties faced the prospect of extensive depositions and document production sought by Green Bank. Green Bank also had the ability to accelerate the Green Bank Debt, giving Green Bank rights to proceed directly against Bellon and Orban for repayment of the Green Bank Debt. Green Bank also sought to determine if it had been defrauded in connection with the Green Bank Debt.

50.     The acceleration of the Green Bank Debt would have been ruinous for the Debtors, as well as other creditors and parties in interest. In addition to the distraction caused by ownership disputes between Bellon and Orban, Green Bank's actions would have crippled efforts to fund and operate a start-up drum manufacturing business like Engy Containers.

51.     Moreover, SWCP sought a TRO shortly after the Petition Date, which litigation remains pending and would have to be litigated if not resolved.  Thus, upon and since the filing of the Debtors' chapter 11 cases, the Debtors identified the following issues, among others, that would likely require costly, time-consuming, distracting efforts to resolve through litigation and appeals:

(a)  Did Bellon have the authority to file Engy's voluntary petition?

(b)  What is the allowable amount of the KOP Notes?

(c) What is the validity, scope and extent of the security interests securing the amounts owing under the KOP Notes?

(d) Who is the rightful owner/operator of Engy?

(e) Whether under _Mitchell v. Bank Illinois_, 316 B.R. 891, 895 (S.D. Tex. 2004), Bellon could re-file Engy's chapter 11 petition if it was determined not to have been a proper filing, as Bellon, as an individual, had subsequently filed chapter 11 and became a debtor-in-possession?

(f) What rights, claims, and causes of action, if any, does Green Bank have against the Borrowers?

(g) Who holds superior rights to certain steel that was ordered by Engy Containers from KOP, but not delivered?

(h) What claims and causes of action does Bellon's individual estate have against third parties (including to recover alleged fraudulent conveyances), and how would those actions be pursued and by whom?

**IV.**

**SUMMARY OF THE SETTLEMENT**

52.     The terms of the Settlement Term Sheet set forth below are copied directly from the Settlement Term Sheet, which is attached to the form of proposed order granting this Motion as "Exhibit A."

53.     Green Bank, Dr. Lo and Bellon have agreed that:

| Green Bank, Dr. Lo and Bellon | By close of business on September 29, 2017, Dr. Lo shall purchase 9.637445% of the Green Bank Debt for $800,000, after accounting for application of the Cash Collateral (defined below) and the principal payment due on September 27, 2017;<br><br>As earlier agreed, the automatic stay in the Chapter 11 Cases |

13

has been modified by agreed order such that Green Bank has applied all amounts in the control account established under the Green Bank loan documents (approximately $1.25 million) (the "Cash Collateral") as a permanent reduction to the Green Bank Debt;[3]

Green Bank shall be paid $950,000 by an outside investor to be identified by Dr. Lo no later than October 30, 2017, to be applied as a permanent reduction to the Green Bank Debt. In the event an outside investor does not make such payment by October 30, 2017, Dr. Lo shall personally make such payment on or before October 31, 2017. In the event Dr. Lo personally makes the $950,000 payment, such payment will be considered an additional purchase of an interest in the Green Bank Debt, and such interest will be calculated as a percentage by dividing $950,000 by the then-outstanding balance on the Green Bank Debt. The additional interest will be treated subject to the same terms and conditions as the original interest purchased by Dr. Lo.

By October 1, 2017, Dr. Lo agrees to provide to Green Bank a letter from a financial institution acceptable to Green Bank, stating that Dr. Lo has available to him at least $1 million in an undrawn line of credit (the "Lo Letter") in order to demonstrate ability to pay the $950,000 set forth above.

SWCP shall with seven (7) calendar days move all operating accounts to Green Bank and maintain the same at Green Bank for so long as the Green Bank Debt remains outstanding.

Monthly payments to Green Bank shall be made as and when due, commencing with the next scheduled monthly payment coming due after execution of this Term Sheet, at the non-default contract rate. This provision does not obviate the requirement to make the September 2017 monthly payment, which must be made by September 29, 2017.

No later than December 15, 2017, Bellon will provide Green Bank with a confirmed letter of credit in an amount equal to the Green Bank Debt then outstanding, or a valid stock pledge with a market value equal to at least 120% of the amount of

---

[3] Dr. Lo agrees that application of the Cash Collateral plus the scheduled September payments on the Green Bank Debt will be applied to the Green Bank Debt and precede any distributions to Dr. Lo with respect to his participation in the Green Bank Debt.

the Green Bank Debt outstanding as of such date, to collateralize/secure the remaining Green Bank Debt (the "GB Collateralization").  No payments may be made by SWCP to KOP unless and until the requirements of the preceding sentence have been met.

Orban shall be released from all obligations to Green Bank, whether under the Green Bank loan documents or otherwise after the Green Bank Debt has been satisfied in full.

All remaining amounts outstanding to Green Bank shall be paid by February 28, 2018.   Effective immediately upon execution of this Term Sheet, and subject to (i) the payments called for above being made to Green Bank as and when due, (ii) the posting of the GB Collateralization, and (iii) the Lo Letter being received, Green Bank shall forbear on all debt collection activity.  If the above requirements are not met, or Green Bank is not paid in full by February 28, 2018, Green Bank may pursue any and all debt collection activities against all collateral of any sort and any remaining obligors on the Green Bank Debt.

Dr. Lo shall loan up to $350,000 to Mowery, which shall, in turn, make a DIP loan to Engy Group and Bellon, to be used solely to pay professional fees allowed by order of the Bankruptcy Court in the Chapter 11 Cases.   The amount advanced by Dr. Lo to Mowery shall be secured by (i) either (A) a second lien on the Mowery property and building if possible and permitted by Third Coast Bank, or (B) a second lien behind Green Bank on Green Bank's SWCP collateral, to which Green Bank consents, as chosen by Dr. Lo in his discretion and (ii) a first lien on the proceeds from the sale of any interest in Sacred Oak Medical Center LLC ("Sacred Oak") owned by Healthcare.  The net proceeds of sale of the first 10% interest in Sacred Oak shall be applied as follows: first, $3 million to KOP (in satisfaction of the payment due to KOP on December 15, 2017, set forth in this Term Sheet); second, to Dr. Lo to repay the outstanding amount of the DIP loan; and third, to Dr. Lo for the balance of the proceeds not to exceed 50% of the gross proceeds.  On any subsequent sale of an interest in Sacred Oak, to the extent the $4.5 million payment due from Engy to KOP has not been made, proceeds shall be distributed: first, to KOP, up to the lesser of (x) $4.5 million or (y) 50% of the gross proceeds of sale; and second to Dr. Lo for the balance of the proceeds not to exceed 50%. Total payments to KOP with respect to the Sacred Oak interest

<table>
<tr><td></td><td>shall in no event exceed $7.5 million.

Dr. Lo shall further receive or retain the following:

- An additional 40% interest in Mowery, resulting in a total ownership interest of 60% of Mowery, for which he shall pay fair market value in cash to Ventures;
- Twenty five percent (25%) of the ownership interests in SWCP;
- Retention of his 50% interest in Healthcare;
- Retention of his 5% interest in Engy Group; and
- A consulting agreement with SWCP entitling him to operational oversight of SWCP and SWCP will agree to customary negative covenants including, without limitation, restrictions on taking on additional indebtedness, giving additional liens or security interests on SWCP assets, and making loans to and entering into contracts with insiders.

The Parties agree and consent to the above-stated transfers and percentages.

Dr. Lo further agrees to forbear from taking any action against Mowery or SWCP regarding lease payment reductions pursuant to the facility lease with SWCP.[4]</td></tr>
</table>

54.     In the Settlement Term Sheet, "KOP" is defined collectively as KOP, Orban and Southwest Container Products LLC.  The KOP Entities have represented to the Debtors that none of their subsidiaries or affiliates have conducted business with Engy or its subsidiaries and, as such, do not need to be parties to the Settlement Term Sheet.

<table>
<tr><td><strong>KOP:</strong></td><td>In full and final satisfaction of all claims, interests, rights, defenses and causes of action among KOP, Bellon and Engy, KOP shall receive the following:

1. Total cash consideration of $8.550 million to be paid as follows:</td></tr>
</table>

---

[4] Pursuant to paragraph 8 of the Loan Participation Agreement, Dr. Lo (as an individual and/or by exercising control over Mowery Plant) agrees to forbear from taking any action against Mowery Plant or Engy Containers until February 28, 2018.

A. Engy shall pay to KOP the aggregate amount of $7.5 million, as follows:

- $3.0 million no later than December 15, 2017, subject to Bellon collateralizing the Green Bank Debt as set forth in the box above; and
- $4.5 million no later than February 28, 2018

B. Bellon shall pay to KOP the aggregate amount of $1.050 million, as follows:

- $600,000 no later than January 31, 2018.
- $450,000 no later than June 30, 2018.

2. Green Bank and Engy shall forfeit any and all rights and claims they may have or allege to have to the approximately 1800 tons of steel previously ordered by, but not delivered or invoiced to, SWCP, which is currently located in a warehouse at the Port of Houston. KOP may dispose of such steel as it may see fit in its sole and absolute discretion.

3. As security to KOP for the payments set forth in 1(A) above, the Bankruptcy Court shall order that Southwest has, and shall be deemed to have, a validly perfected, first priority security interest in, and lien on the following, and Bellon and Engy Group shall agree to a modification of the automatic stay to effect the same: (i) 100% of Bellon's membership interests in Engy Group (83% of the total membership interests outstanding); (ii) 100% of Engy Group's ownership interests in Ventures (100% of the outstanding membership interests); (iii) 100% of Engy Group's ownership interests in Drums (94% of the outstanding membership interests); (iv) 100% of Ventures' interest in Healthcare (which is 50%); (v) 50% of Healthcare's residual interest in Sacred Oak attributable to Ventures' 50% equity interest in Healthcare; and (vi) the residual equity interests held by Engy Group in SWCP (approximately 69%). The equity interests referred to in this paragraph are defined as the "Equity Collateral." In no event shall the liens and security interests referenced in subsection (v) extend to or encumber the 50% interest held by Dr. Lo in Healthcare.

4. As further security to KOP for the $450,000 payment set forth in 1 (B) above, on or before March 1, 2018, Bellon shall

17

collateralize such amount with a confirmed letter of credit in the amount of $450,000 or a valid stock pledge with a market value equal to at least $540,000 (the "KOP Collateralization").

Subject to number 7 below, after execution of this Term Sheet and until the transactions contemplated hereby are fully consummated, no equity interests in any Engy entity shall be distributed or alienated, except as specifically provided for herein.

5. No later than February 28, 2018, Orban shall be removed as an obligor with respect to any and all amounts owing to Third Coast Bank.

6. In the event of a failure to comply with any provision of this Term Sheet, the automatic stay shall immediately lift, without any further notice or court orders, and KOP shall be entitled to immediate possession, control and ownership of the Equity Collateral and the KOP Collateralization. Bellon and Engy Group specifically and knowingly waive any and all defenses to the same occurring and specifically and knowingly agree to cooperate in connection with the transfer of the Equity Collateral and the KOP Collateralization to KOP.

7. In the event Engy decides to issue equity securities of any entity for which the assets or equity interests serve as collateral for the obligations owing to KOP hereunder, KOP agrees to the issuance of debt without regard to interest rate and/or an equity issuance of not more than 33%; *provided, however*, that in the event of issuance of equity, the amount of equity serving as KOP's collateral shall not be less than 50.1% of the post-issuance/post-investment equity in SWCP. KOP shall, however, have the right to review such investment documentation to ensure it contains reasonable and customary provisions.

8. In the event of a default and transfer of collateral pursuant to number 6 above, KOP agrees that Dr. Lo will continue as the day-to-day manager and operator of SWCP for a period of 12 months after the date of such transfer of collateral. In addition, Orban shall immediately become a non-voting board member at SWCP for such 12-month period, subject to the restriction in paragraph 7 above regarding the issuance of equity securities.

9. Following an event of default and KOP taking possession of the collateral, Dr. Lo shall have the right, for a 12-month

| | |
|---|---|
| | period following KOP's exercise of its right to possession, to repurchase KOP's entire ownership interest in SWCP for a purchase price equal to the unpaid balance owing to KOP from Engy plus 6% interest per annum, calculated from the date the event of default occurs through and including the date of payment.<br><br>10. Orban agrees that, within seven (7) days after execution of this Term Sheet, he shall change the name of "Southwest Container Products LLC" to "SCP, LLC" or a similar name acceptable to Orban.<br><br>Upon complete consummation of the transactions contemplated hereby, all collateral discussed in this section of the Term Sheet shall be immediately released and, as appropriate, re-vest. |

55.    The Parties to the Settlement Term Sheet contemplate the following as to the disposition of the chapter 11 cases.

| | |
|---|---|
| **Disposition of Chapter 11 Cases and Implementation of Agreement:** | The transactions contemplated hereby shall be subject to approval by the Bankruptcy Court under Bankruptcy Rule 9019.  The order approving this Term Sheet shall be binding on a subsequent chapter 11 or chapter 7 trustee, and shall inure to the benefit of the parties' respective successors and assigns.<br><br>The Chapter 11 Cases shall remain open and pending until the transactions contemplated hereby have been fully consummated.<br><br>Further, the order approving this Term Sheet shall provide none of Stash or Engy shall file – and specifically and knowingly agree not to file – for relief or protection under any bankruptcy, insolvency or creditor rights/protections laws, whether state or federal, between the date of this Term Sheet and the date that is twelve (12) months after the transactions contemplated hereby have been fully consummated.    The Bankruptcy Court's refusal to approve this provision of the Term Sheet shall not affect the validity or enforceability of the remaining provisions of this Term Sheet. |

56.     The Settlement Term Sheet provides further that:

| | |
|---|---|
| **Mutual Releases:** | Neither Engy Group, Engy nor Bellon, shall receive a discharge or a release of any kind unless and until all payments called for by this Term Sheet are made as and when due and all transactions contemplated hereby have been consummated. Upon full and complete consummation of the transactions contemplated hereby, the Parties, and each of their respective attorneys, advisors, professionals, officers, directors, members and shareholders shall be deemed to have mutually released each other from any and all claims, rights interests and causes of action from the beginning of time until the date of consummation of the transactions contemplated hereby. |
| **Dismissal of Adversary Proceeding:** | Upon full consummation of the transactions set forth in this Term Sheet and the Plan, Southwest shall dismiss Adversary Proceeding No. 17-3372 with prejudice. |
| **Non-disparagement and Mutual Cooperation:** | The Parties to this Term Sheet agree that, except as otherwise required by law, they shall not make to any other person or entity, any oral or written statements which are disparaging, derogatory, or otherwise directly or indirectly impugns any of the parties to this Term Sheet, or any of such parties' business or employment practices or personal matters. |

**V.**

**APPLICABLE LAW SUPPORTING APPROVAL OF THE SETTLEMENT**

57.     Congress explicitly provided mechanisms in the Bankruptcy Code to encourage settlements. "One of the goals of Congress in fashioning the Bankruptcy Code was to encourage parties in a distress situation to work out a deal among themselves." *In re Mirant Corp*., 334 B.R. 800, 811 (Bankr. N.D. Tex. 2005). "Compromises are favored in bankruptcy" because they minimize litigation costs and further the parties' interest in expediting the administration of a bankruptcy case. *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 COLLIER ON BANKRUPTCY ¶ 9019.03[1] (15th ed. Rev. 1993)).

58.     Bankruptcy Rule 9019 governs the procedural requirements to be followed before a settlement may be approved. Bankruptcy Rule 9019(a) provides in relevant part that: "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise and settlement." FED. R. BANKR. P. 9019(a). Bankruptcy Rule 9019(a) empowers a bankruptcy court to approve compromises and settlements if they are "fair and equitable and in the best interest of the estate." *In re Cajun Elec. Power Coop., Inc*., 119 F.3d 349, 355 (5th Cir. 1997); *In re Foster Mortgage Corp*., 68 F.3d 914, 917 (5th Cir. 1995). Moreover, Bankruptcy Code section 105(a) provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

59.     Approval of a proposed settlement is left to the sound discretion of the reviewing court. *See, e.g., In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998) (noting that courts should exercise their discretion "in light of the general public policy favoring settlements"). The burden of establishing the fairness of a compromise rests on the proponent(s) of the compromise; however, a debtor is not required to present a full mini-trial or evidentiary hearing to adjudicate the issues being settled. Rather, when determining whether to approve a compromise, the court "is not to decide the numerous questions of law and fact raised" by the compromise, but is "to canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *In re W.T. Grant Co*., 699 F.2d 599, 608 (2d Cir. 1983) (internal citations omitted); *In re Mirant Corp*., 348 B.R. 725, 743 (Bankr. N.D. Tex. 2006).

60.     A bankruptcy court should approve a settlement under Bankruptcy Rule 9019 if the settlement is within a range of reasonableness, fair and equitable, and in the best interest of the bankruptcy estate. "In deciding whether a settlement of litigation is fair and equitable, a

judge in bankruptcy must make a well- informed decision, comparing the terms of the compromise with the likely rewards of litigation." *In re Cajun Elec. Power Co-op., Inc.,* 119 F.3d 349, 356 (5th Cir. 1997) (citations omitted); *see also Protective Committee for Independent Stockholders of TMT Trailer Ferry v. Anderson,* 390 U.S. 414 (1968); *United States v. AWECO, Inc. (In re AWECO, Inc.), 725 F.2d 293* (5th Cir. 1984); *Rivercity v. Herpel (In re Jackson Brewing Co.), 624 F.2d 599 (5th Cir. 1980).* Moreover, a bankruptcy court need not be convinced that the proposed settlement is the best possible, but "need only conclude that the settlement falls within the reasonable range of litigation possibilities somewhere above the lowest point in the range of reasonableness." *In re Nutritional Sourcing Corp.,* 398 B.R. 816, 833 (Bankr. D. Del. 2008).

61.    The Fifth Circuit has directed that, in determining whether to approve a proposed settlement, a bankruptcy court must evaluate the following factors: (1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) all other factors bearing on the wisdom of the compromise. *In re Age Refining, Incorporated, 801 F.3d 530 (5th Cir. 2015); In re Jackson Brewing Co., 624 F.2d at 602*.

62.    Under the third, catch-all provision, the Fifth Circuit has specified two additional factors. First, the bankruptcy court should consider the best interests of the creditors, "with proper deference to their reasonable views." *In re Foster Mortgage Corp.,* 68 F.3d 914, 917 (5th Cir. 1996). Second, the bankruptcy court should consider "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Id.* at 918 (internal citations omitted).

22

63.     The Debtors believe that the proposed settlement satisfies the requirements established by the Supreme Court in *TMT Trailer* and further defined by the Fifth Circuit Court of Appeals.

## VI.

## ANALYSIS OF PROPOSED COMPROMISE

64.     **The Settlement Falls Within the Range of Reasonableness.** The Debtors have weighed the reasonableness factors for purposes of Bankruptcy Rule 9019 and submit that the agreements set out in the Settlement Term Sheet falls within the range of reasonableness. More importantly, the agreements embodied in the Settlement Term Sheet provide for infusion of new capital by Dr. Lo, the agreement of Green Bank to forbear until it is re-financed out by a date certain in 2018 and payment of substantial amounts to KOP within a short period of time and cooperation of four necessary parties to work together to save the valuable drum manufacturing business at Engy Containers. Continued litigation between Bellon and Orban cannot achieve any of the results obtained through settlement.

65.     **The Probability of Success in the Litigation, with Due Consideration for the Uncertainty in Fact and Law.** The continued prosecution of the ownership/control litigation between Bellon and Orban does not guarantee a result superior to the result obtained under the Settlement Term Sheet, and does not solve the problem of keeping the drum business at Engy Containers funded and operating. Without the injection of new capital by a third party (which Dr. Lo is doing here) and agreement by Green Bank to stand down, Engy Containers would eventually have to file for chapter 11 and most likely dispose of its assets through a Bankruptcy Code section 363 sale.

66.     Without additional capital expenditures to complete its construction, the Debtors believe that Engy Containers would not fetch a sale price that would generate enough proceeds to cover any claims in excess of the Green Bank Debt.

67.     In such event, SWCP would have to seek to payment directly from Bellon. Since Bellon filed chapter 11 individually, his estate presently does not have any assets that can be monetized quickly. Bellon's estate would, among other things, have to recover alleged fraudulent transfers from foreign third parties. Such efforts would prove both time consuming and expensive, posing significant risk of collection.

68.     Even if SWCP were to prevail on its argument that Bellon did not have proper authority to file a voluntary chapter 11 petition for Engy and the Engy case was dismissed, certain case law supports the proposition that Bellon, now as a debtor-in-possession individually, could simply re-file a voluntary chapter 11 petition for Engy. As a result, any rulings in favor of either party would surely be subject to an appeal, adding additional time and expense to the proceedings.

69.     Finally, as set forth above, Engy, Bellon and, potentially, Green Bank dispute the allowability, scope and extent of the claims and security interests asserted under the KOP Notes and related Pledge Agreements.

70.     Based on the various disputes described herein, the probability is high that a chapter 11 trustee would be appointed over Engy, and, in turn, over the subsidiary companies. Such actions would divest both Bellon and Orban of ownership of Engy and its subsidiaries until the trustee reached either a legal or business solution. A trustee would certainly add additional costs (likely significant) to the litigation and could be highly disruptive to the fundraising and day-to-day operations of Engy Containers.

24

71.     Based on the above, and taking the overall litigation posture and claims and causes of actions alleged by each party into account, the amount to be paid to KOP under the Settlement Term Sheet is far more beneficial for all concerned when compared with the time, expense and potentially disastrous consequences for Engy Containers' operations that would ensue as a result of protracted litigation.  The Settlement Term Sheet maximizes value for all of the signatories thereto.

72.     These factors weigh heavily in favor of both entering into, and Bankruptcy Court approval of, the Settlement Term Sheet.  These facts also support the Debtors' position that the agreed amounts to be paid to KOP and Green Bank fall within the reasonable range of litigation possibilities: somewhere above the lowest point in the range of reasonableness.

73.     **The Complexity and likely Duration of the Litigation and any Attendant Expense, Inconvenience and Delay.** ***The Bellon-Orban Litigation is Complex***. The Bellon-Orban litigation involves complex legal issues involving questions under emerging law on limited liability companies, interpretation of different state statues on limited liability companies, the ability of a debtor-in-possession to exercise rights under collateral pledged pre-petition, the allowability of amounts owed under the KOP Notes, whether the KOP claims are subject to disallowance and even equitable subordination or recharacterization, and whether KOP could, in fact, actually retain any amounts paid to it without an agreement by Green Bank not to invoke certain subordination provisions in the Credit Agreement.   The parties' positions to date make clear that if not promptly settled, the parties will dig in for lengthy, complex and protracted litigation.

74.     ***The Extended Duration of the Bellon-Orban Litigation***. The continued prosecution of the Bellon-Orban litigation to a judgment will take many years. There would also

likely be appeals, in which case the Debtors would incur significant litigation expenses for years to come.

75.     Second, the attendant costs of the continuing the litigation will be significant. Unless decided by a court early in the litigation, the parties would most likely need to retain legal scholar experts on limited liability company law.  Moreover, there is the possibility of extra-territorial disputes against residents of foreign countries and the attendant complexity and expense of the same, along with a yet-to-be-determined risk of collection.  Consequently, approval of the Settlement Term Sheet is in the best interests of the Debtors' chapter 11 estates, their creditors, and their parties-in-interest.

76.     Resolving the parties' multiple disputes now allows the Debtors to ensure tangible and immediate benefit to their estates. The entry into the settlement will allow the parties to resolve the raison d'être for the Debtors' bankruptcy filings. The settlement will also allow for resolution of the chapter 11 cases such that the only remaining activity of the estates will be to monitor the implementation of the settlement and enforce any violation of the Settlement Term Sheet.

77.     **All Other Factors Bearing on the Wisdom of the Compromise**.

a.     **<u>Collection Risk</u>**. As to whether there may be significant difficulties in collecting on any judgment, the Debtors submit that this risk factor is not applicable to this compromise. The claims at issue involve payment of amounts from parties aligned with the Debtors, not collecting amounts from third parties.  It is not clear whether any counterclaims asserted by the Debtors would have resulted in affirmative recoveries to their estates. The counterparty to the Debtors on such suit (SWCP) possesses a claim of

anywhere from $9,000,000 to in excess of $12,000,000 – which is at least in part disputed by the Debtors – which it could potentially offset against any award in favor of the Debtors.  That said, though, in the event claims are asserted against foreign parties, collection risk is indeed a factor and such risk has not yet been fully evaluated.  There is always risk of collection with extra-territorial litigation is an issue.

b.  **Views of the Creditors**. Under the catch-all provision, the Fifth Circuit has directed the courts to consider the best interest of the creditors, "with proper deference to their reasonable views." Orban, Dr. Lo and Green Bank hold claims that comprise more than 85% of the debt against Engy. These same claims also represent majority of the claims in the Bellon chapter 11 case. The majority of creditors support the approval of the settlement.

c.  **Nature of Negotiations**.   Again under the catch-all provision, the Fifth Circuit directs the courts to consider "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." The settlement is the product of arm's length negotiations among the four Parties, represented by counsel, and negotiated over an extended period of time. Negotiations were intense and hard-fought.  The Parties worked together over the settlement and documenting the Settlement Term Sheet for three full days, culminating in a line-by-line drafting and final negotiation session over a 15-hour period. These negotiations were truly arm's-length and held in good faith.

d.  **<u>The Releases are Reasonable.</u>**  The settlement requires the Parties to execute and deliver mutual releases. Section 363(b)(1) of the Bankruptcy Code provides that a debtor may use property of the estate other than in the ordinary course of business when there is a "sound business purpose" that justifies such use of estate property. See *In re Montgomery Ward Holding Corp*., 242 B.R. 147, 153 (D. Del. 1999). Once the debtor articulates a valid business justification for a particular form of relief, the bankruptcy court should review the request under the deferential "business judgment" rule. The bankruptcy court should approve a debtor's business decision, unless it is the product of bad faith, whim or caprice. *In re HQ Global Holdings, Inc.,* 290 B.R. 507, 511 (Bankr. D. Del. 2003). Bankruptcy Code section 105(a) empowers the bankruptcy court to "issue any order, process, or judgment that is necessary to carry out the provisions of the Bankruptcy Code. 11 U.S.C. § 105(a). Settling claims against the Debtors' estates represents the proper use of estate property, is justified here, and should be approved by the Bankruptcy Court.

e.  Here, the releases set forth in the Settlement Term Sheet are not only integral to and a necessary part of the settlement as a whole, but they are reasonable in scope. Such releases should also not have an impact on potential direct claims held by non-settling parties. *See*, *e.g.*, *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 644 (Bankr. S.D.N.Y. 2012) (finding releases "reasonable and necessary to accomplish the purposes" of the settlement agreement where they did not impact potential direct claims by non-settling parties).

## VII.

## **WAIVER OF BANKRUPTCY RULE 6004**

78.     The Debtors request that any order approving this Motion be effective immediately, thereby waiving the 14-day stay period imposed by Bankruptcy Rule 6004(h). This waiver of the 14-day stay period is necessary for the settlement to be implemented as expeditiously as possible and within the time frames contemplated by the Settlement Term Sheet. The Debtors request that the Bankruptcy Court eliminate the 14-day stay period imposed by Bankruptcy Rule 6004(h).

## VIII.

## **NOTICE**

79.     Notice of the Motion shall be given to all parties on the creditor matrix filed in both chapter 11 cases.

## IX.

## **CONCLUSION**

80.     The Debtors submit that the proposed compromise satisfies the requirements established under Bankruptcy Rule 9019, the Supreme Court in *TMT Trailer* and applicable Fifth Circuit law. In light of these considerations, the Debtors believe that the proposed compromise falls well within the range of reasonableness, especially in light of the practical reality that "compromises are . . . often times desirable and wise methods of bringing to a close proceedings otherwise lengthy, complicated and costly." *Rivercity v. Herpel* (*In re Jackson Brewing Co.*), 624 F.2d 599, 602 (5th Cir. 1980) (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)). Engy respectfully requests that the Bankruptcy Court grant the relief requested in his Motion and approve the proposed compromise set out in the Settlement Term Sheet.

29

WHEREFORE, the Debtors respectfully request that the Bankruptcy Court enter an order in the form attached hereto (i) approving the Debtors' settlement with the parties set out in the Settlement Term Sheet, (ii) authorizing and directing the Debtors and the other Parties to the Settlement Term Sheet to perform thereunder and do such things, and execute and deliver any such document that may be reasonably necessary to close and implement the Settlement Term Sheet, and (ii) granting such other and further relief to which the Debtors may be entitled.

DATED: October 11, 2017

Respectfully submitted,

DIAMOND McCARTHY LLP

*/s/ Kyung S. Lee*
Kyung S. Lee
TBA No. 12128400
klee@diamondmccarthy.com
Charles M. Rubio
TBA No. 24083768
crubio@diamondmccarthy.com
Two Houston Center
909 Fannin, 37th Floor
Houston, TX 77010
Telephone: (713) 333-5100
Facsimile: (713) 333-5199

*Counsel for The Engy Group, LLC*

HOOVER SLOVACEK LLP

*/s/ Edward L. Rothberg*
Edward L. Rothberg
TBA No. 17313990
Rothberg@hooverslovacek.com
Galleria Tower II
5051 Westheimer, Ste. 1200
Houston, TX 77056
Telephone:  (713) 977-8686
Facsimile:  (713) 977-5395

*Counsel for Francois Stanislas Bellon*

**EXHIBIT A**

**CORPORATE ORGANIZATION CHART**



**EXHIBIT B**

**LOAN PARTICIPATION AGREEMENT**

# LOAN PARTICIPATION AGREEMENT

THIS LOAN PARTICIPATION AGREEMENT ("Agreement"), is effective as of the date all parties have signed (the "Effective Date"), by and between Green Bank, N.A., with its primary office located at 4000 Greenbriar Dr, Houston, TX 77098 ("Bank"), and Dr. Kenneth Lo ("Participant") on the terms described below.

> This Agreement is not intended to be the sale of a security pursuant to the Securities Act of 1933. However, if so interpreted, this sale is exempted from any registration requirements as a private sale under § 4(a)(2) and Reg D because there has been no solicitations and Participant qualifies as an accredited investor.

## Recitals

Bank holds a term note dated February 27, 2017, executed by Engy Southwest Containers, Inc. ("Engy-Containers"), Texas Engy Drums, Francois-Stanislas Bellon, and Kurt Matt Orban (collectively referred to as "Borrowers") in favor of Bank (the "Term Note") which currently is outstanding in the amount of $7,278,545.53.

Moreover, certain revolving credit was granted to Borrowers which is outstanding in the amount of $ 1,143,440.98 (the "Credit Line").

Collectively, the Term Loan and the Credit Line are referred to as the "Loans" and are attached hereto as "Exhibit A."

Bank has already distributed the funds of the Loans to Borrowers. As of today, Bank claims that Borrowers are in default and that Bank has the right to foreclose on all of the collateral securing the Loans, including all of the equipment and inventory of Engy Southwest Containers Products, Inc.

Bank has promised that it will forebear foreclosure in consideration of: 1) Participant purchasing 9.637445% interest in the Loans for a sum of $800,000;[1] 2) the partial lifting of the bankruptcy stay in place against the assets of Francois-Stanislas Bellon so as to release $1.25 million of cash currently held in reserves to Bank -- to be used to pay down the balance of the Loans (this has occurred and the amounts above reflect the offset of such funds); and 3) a promise from Participant to provide the bank with an additional $950,000 by the October 31, 2017(the "Bank-Participant Forbearance Agreement").

In a separate agreement between Participant and Engy Containers—which is made in consideration of Participant's efforts in getting a forbearance granted to Engy Containers and

---

[1] Participant's percentage interest is taken by adding together the balances of the Term Note and the Credit Line and then subtracting the $1.25 million in reserve (which has already been applied to the Credit Line pursuant to an order in the Bankruptcy Court) and $121,030.98 which is currently due as a monthly payment to reach the "Amount Due." The $800,000 is then divided by this Amount Due.

Page 1 of 4



others—Participant will be given a 25% membership interest in Engy Southwest Containers, Inc. and a consulting agreement which entails certain managerial rights (the "Participant-Containers Agreement"). Bank hereby acknowledges it is informed of Participant's forthcoming interest in one of the Borrowers of the Loans.

This Agreement is made to complete the first part of the Bank-Participant Forbearance Agreement.

## Agreement

The parties hereto agree as follows:

**Condition Precedent.**

1.      It is a condition precedent to entering into this agreement that a binding term sheet be signed by The Engy Group LLC (and its subsidiaries), Green Bank, Kurt Orban Partners, Matt Orban, and Francois-Stanislas Bellon.

**Method of Payment to Participant.**

2.      Participant shall hold all rights that Bank holds under the Loans, except that Bank shall be the party (on behalf of Bank and Participant) who will exercise any rights to collect the amounts owed on the Loans through suit, foreclosure, or otherwise, unless Bank unreasonably refuses to collect such funds after receiving written demand from Participant.

3.      Participant shall be paid 9.637445% of all sums collected to pay principal and interest on the Loans no matter how such funds are collected, including but not limited to collection through: proper repayment, lawsuit, bankruptcy, foreclosure,. Participant shall collect its 9.637445% of said funds collected even if Participant does not participate in Bank's efforts to collect the funds. All payments to Participant by Bank on account of Participant's percentage ownership shall be calculated after deducting Bank's reasonable and necessary fees and expenses incurred in connection with the collection of the Loans from September 29, 2017 forward.

4.      Participant has an obligation, per the Term Sheet referenced in par. 1 above, by October 30, 2017, to provide an investor who will pay $950,000 to be applied to the Loans, or for Participant to pay such $950,000 sum by October 31, 2017. In the event Participant cannot provide such investor and must make the payment, Participant's $950,000 payment will be considered an additional purchase of an interest in the Loans, such additional interest to be calculated as a percentage by dividing $950,000 by the then-outstanding balance on the Loans. Such additional interest will be treated subject to the same terms and conditions as the original interest purchased by Participant.

5.      Bank agrees to not settle the Loans for less than the total amount owing on the Loans unless it obtains Participant's consent.

6.      Bank shall have 10 days from the date it collects any funds to distribute said funds Participant.

AUS-6425128-v1



**Participant's Responsibilities.**

7.     Upon all parties signing this Agreement, Participant shall wire to Bank $800,000, such amount to be received by Bank before close of business September 29, 2017. 7.     Participant will not hinder any collection efforts of the Loans, whether such collection efforts are against Engy Containers or any co makers of the Loans.

8.     Participant will forebear from exercising its control over Mowery Plant LLC to foreclose on the property of Engy Containers which is collateral for the Loans without consent of Bank, so long as the balance on the Loans is outstanding.

**Bank's Responsibilities.**

9.     Other than the obligation to make such payments to Participant as detailed above, Participant agrees that Green Bank owes Participant no duties or obligations of any sort, including but not limited to any sort of fiduciary duty.

10.     Participant further agrees that Participant will have no rights whatsoever to determine, dictate, or in any other way decide any aspects of the management of the lending relationship with Borrowers, and that Green Bank will have the right, in its sole discretion and judgment, to release responsible parties or collateral, extend terms of repayment, alter, or otherwise in any way modify any aspect of the debtor – creditor relationship between Green Bank and Borrowers.
**Covenants.**

11.     Bank has the power and authority to own its properties, to carry on its business in the manner in which it conducts such business and to execute, acknowledge and deliver this Agreement.

12.     Bank is the sole owner of the Loans (subject to Participant's participation interest therein), has full legal authority, has taken all required corporate action and obtained all consents required to sell, transfer and assign the participation interest to Participant, and (subject to Participant's participation interest therein), is free and clear of all claims and encumbrances of any type.

13.     All documents or instruments pertaining to the sale of the participation interest are properly authorized, executed and valid and binding on Bank.

14.     To the Bank's knowledge, each Loan Document executed is genuine, was duly authorized, executed and delivered and is the legal, valid and binding obligation of each party thereto, enforceable in

15.     All present costs, fees and expenses incurred in underwriting, closing and funding any Loan and recording any instruments have been paid or are not assessable against the Participant.

16.     Exhibit A is a true and correct copy of the Loans.

**Miscellaneous Provisions.**

17.     This Agreement represents the final agreement between the parties with regards to the Loan Participation Agreement and may not be contradicted by evidence of prior or contemporaneous oral agreements of the parties. There are no unwritten, oral agreements between the parties. This paragraph is in no way meant to prevent any negotiation or amendments to the Settlement Agreement which is a condition precedent to this Agreement.

18.     Bank shall make a note in its files that the Term Note and Credit Line are restricted and not to be used as commercial paper or assigned without the consent of Participant.

19.     Caption headings in this Agreement are for convenience only and are not to be used to interpret or define provisions of this Agreement.

20.     This Agreement may be executed in any number of counterparts with the same effect as if all signatories had signed the document.

21.     This Agreement will be governed by federal law applicable to Bank and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflict of law's provisions.

22.     Maker and Guarantor agree that all suits arising from the transaction that is evidenced by this Agreement must be held in Harris County, Texas.


_____

Dr. Kenneth Lo

By: _Philip W. Stagg, EVP_

On behalf of Green Bank, N.A.

AUS-6425128-v1

17.     This Agreement represents the final agreement between the parties with regards to the Loan Participation Agreement and may not be contradicted by evidence of prior or contemporaneous oral agreements of the parties. There are no unwritten, oral agreements between the parties. This paragraph is in no way meant to prevent any negotiation or amendments to the Settlement Agreement which is a condition precedent to this Agreement.

18.     Bank shall make a note in its files that the Term Note and Credit Line are restricted and not to be used as commercial paper or assigned without the consent of Participant.

19.     Caption headings in this Agreement are for convenience only and are not to be used to interpret or define provisions of this Agreement.

20.     This Agreement may be executed in any number of counterparts with the same effect as if all signatories had signed the document.

21.     This Agreement will be governed by federal law applicable to Bank and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflict of law's provisions.

22.     Maker and Guarantor agree that all suits arising from the transaction that is evidenced by this Agreement must be held in Harris County, Texas.

_____
Dr. Kenneth Lo

By: _____

On behalf of Green Bank, N.A.

AUS-6425128-v1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served by the Court's CM/ECF service to all parties registered to receive electronic notice in this case on the 11th day of October 2017.

*/s/ Kyung S. Lee*